IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LINDA PEARSON-HEFFNER, as          )
Executrix and Personal Representative   )
of the Estate of Gillium Walker          )
Waddell, Jr.,                            )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )      CIVIL ACTION NO. 2:02CV549-VPM
                                         )
UNITED STATES OF AMERICA,                )
etc.,                                    )
                                         )
                    Defendant.           )

## MEMORANDUM OPINION

This civil action was brought against the United States by LINDA PEARSON-HEFFNER ["Pearson-Heffner"] to recover damages for the wrongful death of the decedent, GILLIUM WALKER WADDELL ["Waddell"], a United States veteran. The action is prosecuted by the executrix of Waddell's estate and his personal representative., who seeks damages for personal injury and wrongful death. For the reasons stated in this Memorandum Opinion, the court concludes that defendant did not negligently cause Waddell's pain and suffering nor his death. Thus the defendant is not liable under § 6-5-410, *Code of Alabama*, 1975, or derivatively under the Federal Tort Claims Act, 28 U.S.C. §2671 - 2680.

## I.   PROCEDURAL HISTORY

Pearson-Heffner filed her complaint pursuant to the Federal Tort Claims Act

["FTCA"], 28 U.S.C. § 2671 - 2680 and Alabama's Wrongful Death Statute. She invoked this court's jurisdiction pursuant to 28 U.S.C. § 1346(b).[1] The claims arise from the alleged conduct of the United States through the employees of the hospital operated in Montgomery, Alabama by the U.S. Department of Veterans Affairs ["the VA"]. It is undisputed that Pearson-Heffner exhausted her administrative remedies by submitting claims to the government on 22 January 2002 in excess of $10,000,000. The government denied her claim on 3 May 2002.

Waddell was diagnosed in June 2001 with stage-four prostate cancer. Before that time, he clearly had the disease but had not been treated for it. Moreover, although he underwent P.S.A. testing in 1999 and in early 2000, no testing was done during three additional visits to the Veterans Administration Hospital ["the VA"][2] in September and December 2000 and March 2001. Waddell died in September 2002. Pearson-Heffner claims that the VA's management of Waddell's health constituted "substandard care" which deviated substantially from acceptable standards of care, because the VA failed to administer prostate cancer screening to Waddell. For that, she contends, his estate is entitled to damages

---

[1]The statute provides, in pertinent part, that "the district courts . . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

[2]Notwithstanding this generic designation, the record should reflect that Waddell was a patient in the Central Alabama Veterans Health Care System (Doc. # 6, p. 3).

against the government in the amount of $10,000,000.

Waddell died  of complications from prostate cancer on 15 September 2002, before the non-jury trial of this case.  Pearson-Heffner, who resides in Daleville, Alabama, was appointed executrix of Waddell's estate in December 2002.

# I.    FINDING OF FACTS[3]

### A.    *Waddells' Estate and His General Condition Before Death*

As a result of a friendship that they established as residents of Daleville, Alabama, Pearson-Heffner became the executor of Waddell's estate (TR-1, 144). Her standing to bring the lawsuit was established at the trial, and it is not challenged by the defendant.[4]

Waddell lived in Orlando, Florida before moving to Daleville in approximately 2000 (TR-1, 158).  He moved to Daleville and lived in a motor home parked on property belonging to Martha Gallo ["Gallo"] (TR-1, 159).   Shortly thereafter, he moved into Gallo's home. Waddell regularly saw doctors at the VA Hospital in Montgomery, and in 2000 and 2001, he also saw doctors in Ozark and Dothan, Alabama.

In fact, he was diagnosed with metastatic carcinoma from the prostate at Flowers

---

[3]The draft transcript in this case was prepared in two volumes.  Volume One ["TR-1"] covers the first day of the two-day trial, and Volume Two ["TR-2"] covers the second day. Although the court has determined that the plaintiff may take nothing by this lawsuit, the court has entered findings of fact beyond that ruling to provide a full record.

[4]See PX-38.  The parties agreed that damages for wrongful death in this case should ultimately go to Waddell's surviving children.  Because the plaintiff in this case is Waddell's estate, however, the court does not concern itself with ultimate distribution.  Waddell's estate is very small.

Hospital in Dothan on 26 June 2001, with a P.S.A. of 1400 (TR-1, 26, 32, 160).   During his hospitalization in Dothan, doctors performed a craniotomy on Waddell to remove some of the cancerous tumor.  They determined that the tumor had metastacized from elsewhere in the body, and because of his elevated P.S.A., concluded that it originated in his prostate (TR-1, 34-36).[5]   At Flowers, Waddell also underwent a biopsy of his prostate, where doctors found another malignant tumor (TR-1. 36).

After Waddell's diagnosis, he returned to Gallo's residence, where he experienced "a continual deterioration in his abilities" (TR-1, 161).  Waddell was able to move about on a limited basis, and he took care of his personal needs for a "few weeks" (TR-1, 162).  Later, however, his condition required Hospice care, including nurse visits, bathing and dressing.  Waddell remained in Gallo's home until he entered a nursing home for end-stage Hospice care, where he remained for slightly more than a month (TR-1, 162).

After his transfer, Waddell was "very unhappy", asking Gallo frequently to remove him from the nursing home (TR-1, 163).  Eventually, he could not get out of bed, and thereafter, he was transferred to the VA Hospital in Birmingham, and later to the VA Hospitals in Montgomery and Tuskegee (TR-1, 163-164).  His condition continued to deteriorate until Waddell died of stage-four prostate cancer in 15 September 2002 at the Tuskegee VA (TR-1, 26, 166; PX-21).

---

[5]Dr. Barry L. Singer ["Dr. Singer"], Pearson-Heffner's expert, testified that the cancer in Waddell's brain "came from another site" and that " the pathologist felt it came from another site because adenocarcinomas don't occur in the brain as a primary tumor" (TR-1, 35).

Before his death, Waddell's income was limited to monthly Social Security disability benefits of $712.00 (TR-1, 152; PX-38).  He had no life insurance and his estate was not entitled to receive any monetary benefits at his death (TR-1, 154).  Moreover, Waddell had no liquid assets, i.e., no monies in any accounts.

When he died, Waddell was survived by an adult son, an adult daughter, and a 17-year-old grandson (TR-1, 147).   In his will,[6] Waddell left (1) the sum of one dollar to his grandson "and his love and affection" (TR-1, 147), (2) two gold rings to his children, Gill and Margaret, and (3) the remainder of his estate to Martha Gallo (TR-1, 146-147).  The only assets in the "residual estate" are a camper, a Riviera and a van" (TR-1,. 153).   At the time of his death, the camper was worth approximately $300, and the van was worth approximately $500 (TR-1, 153).[7]

### B.    *The Details of Waddell's Treatment*

During Waddell's treatment at the VA Hospital in Montgomery, he was treated by Dr. Monjurul Islam ["Dr. Islam"], a board certified internist, who first saw Waddell as a patient on 9 December 1998 (TR-1, 98-99, 124).[8]  Waddell, who was 63 at the time, reported with

---

[6] See DX-22.

[7] The information about Waddell's surviving children and his bequests to them is undisputed (TR-1, 150-151).

[8] See PX-11 and DX-16.  Margaret Jernigan ["Jernigan"], a patient services associate at the V.A., also testified at the trial.  Jernigan was a 24-year-veteran of the V.A. and had worked at the Montgomery V.A. for three years (TR-2, 23).  Jernigan was a registered nurse who worked in primary care.

"back pain and angina", and Dr. Islam treated him for those symptoms (TR-1, 99-100, 124). Waddell's stress test that day was negative, and he was treated for specific symptoms.  Dr. Islam did not consider the December 1998 examination as an annual examination (TR-1, 105, 124).

Waddell advised the V.A. that he had undergone a P.S.A. test in August 1998 which yielded a result of 1.4, i.e., "in the normal range" (TR-1, 100, 125).[9]  Although there was no strict "protocol" or policy at the Montgomery VA for administering P.S.A. testing (TR-1, 103), doctors at the hospital "check an annual exam for prostate cancer screening, colorectal cancer and screening" (TR-1, 104).  Moreover, the medical staff performs a "P.S.A. check, rectal exam check annually with the patient" (TR-1, 116).   Doctors at the V.A. performed annual "prostate screening, education and we do the P.S.A. also" (TR-1, 117), but the administration of P.S.A. testing

> depends on the physician.  The physician on his clinical judgment orders the test, they do the prostate screening. But what I am saying, usual [sic] at age fifty we do educate the patient about the prostate screening. . . . .Nurses tell it [information about the P.S.A.] to them and [doctors] also tell them.

---

[9]See also TR-2, 29.  A prostate specific antigen, or P.S.A.,  test is not guaranteed to determine the presence or extent of cancer.  As patients age, they tend to have rising P.S.A.'s. The American Cancer Society advises physicians to tell their patients over fifty about the P.S.A. test, that it can be done "on a yearly basis", and that, when done in conjunction with a digital rectal examination, P.S.A.'s "are very effective" in detecting prostate cancer "at its earliest stages" (TR-1, 27).

(TR-1, 118-119).[10]   As part of the veterans' education about prostate cancer, they were encouraged to get a P.S.A test done, but "that was their choice", not the doctor's (TR-2, 38).

Waddell next saw Dr. Islam on 2 March 1999 after his wife died (TR-1, 127).  He was apparently slightly depressed.  His visit was not an annual visit; rather, he was there for "an acute problem" (DX-35; TR-2, 31).  No P.S.A. test was done then (TR-1, 105).

Waddell did not keep his appointment scheduled in 8 April 1999 for laboratory tests (TR-1, 136), and the records do not reflect whether he was to have undergone a P.S.A. test. He also missed his appointments on 3 May 1999, 18 June 1999 and 2 July 1999.  On those dates, Waddell was supposed to have been seen by a physician (presumably Dr. Islam), and he was scheduled to have laboratory work done (TR-1, 137).  Thus, after March 1999, Dr. Islam did not see Waddell again during the remainder of 1999 and for most of 2000 until 12 September 2000, when he directed that a P.S.A. test be performed on him "[i]n three to four months".  In fact, the record made for that visit specifically directed that a P.S.A. was to be performed in "three to four months" from September 2000, during Waddell's "annual exam appointment" (TR-1, 131-132).  The September 2000 visit was not an annual examination, and Dr. Islam never gave him an annual examination (TR-1, 130; TR-2, 39-40).

Waddell returned to the hospital on 26 December 2000 to "checkup for his cough and

---

[10]When Dr. Islam saw Waddell on 3 March 1999, he directed in his notes that, in four months, Waddell undergo tests, including "lab, C.B.C., chem fifteen" (TR-1, 128).  He acknowledged, however, that, as a matter of routine, doctors do not personally assure that patients receive the rests; rather, patients "schedule [their] time by the secretary and they keep their appointment" (TR-1, 128).

cold" (TR-1, 108-109),[11] but no P.S.A. test was done at that time (TR-1, 108, 123).  Although

Dr. Islam was the only VA physician treating Waddell at that time (TR-1, 122-123), contrary

to his notes made in September, no follow-up testing was done in December, because it was

not the VA's custom to give a patient a physical examination when he complained of an

acute problem (TR-2, 33).

Waddell again missed his appointment scheduled for  2 January 2001.  The hospital

records reflect that Waddell was scheduled for a laboratory appointment at 9:20 a.m. and an

appointment with Dr. Islam at 10:20 a.m. (TR-1, 135).  Waddell did not contact the hospital

again until 17 January 2001, when he called to request a change in his "provider" (doctor)

because he wasn't satisfied with Dr. Islam (TR-2, 34).[12]  He was changed to  - and given an

appointment with -  Dr. Wright (TR-1, 110).  Had Waddell kept his 2 January appointment,

his "annual visit" would have occurred on 17 January and his laboratory tests would have

been done (TR-1, 110).

Waddell's next appointment was on 7 March 2001 (TR-1, 111),[13] and no P.S.A. test

was done on that date.  Because his appointment lasted only 20 minutes, it was described as

"an initial visit" (with Dr. Wright), because "[p]hysical appointments at that time were slated

for forty minute slots" (TR-2, 35-36)  The records from March 2001 included notations that

Waddell received prostate cancer education and that he needed a prostate examination (PX-

---

[11]See PX-38.

[12]See PX-5.

[13]See PX-36.

36; TR-2, 52). Such records were are generally made before a patient sees the physician (TR-2, 54). Ordinarily, the notation would have been sufficient to schedule a P.S.A. test, but no testing was done. The records would not necessarily reflect the physician's D.R.E. examination, nor would it reflect Waddell's rejection or refusal of a P.S.A. test (TR-2, 36-37).

Dr. Islam did not treat him again until after June 2001 (TR-1, 115), after his cancer was diagnosed, but there was no evidence of the details of the treatment administered on that date.[14] Waddell was scheduled to returned to the V.A. on 20 June 2001, but he did not keep the appointment; the records do not reflect whether it was an annual examination or a follow-up visit (TR-2. 36). Instead of returning to the V.A., Waddell went to the emergency room at Flowers Hospital in Dothan, Alabama on 26 June 2001 because he was having severe headaches, back pain and communication difficulties. He underwent an MRI and CT scan which revealed a brain tumor; a later P.S.A. yielded a reading of over 1400, and medical providers there diagnosed him with stage-four prostate cancer.

He returned to the Montgomery VA on 5 September 2001, when he was seen by Dr. Wright (TR-1, 121). During that visit, Dr. Wright wrote that the VA "needs more continuity of information for the primary care team, maybe a phone call to speed up missed labs" (TR-1, 121).[15] Waddell never refused to have a P.S.A. test done (TR-1, 121).

---

[14]The defendant admits, however that "it did not perform a P.S.A. test on the plaintiff" between January and July 2001" (Doc. # 6, p. 3).

[15]See PX-4.

9

**C.      *The Plaintiff's Expert Analysis of Waddell's Treatment***

Dr. Barry L. Singer ["Dr. Singer"],[16]  the plaintiff's expert, is a physician who practices in Norristown, Pennsylvania[17] (TR-1, 4).  According to Dr. Singer, the cause of Waddell's death was metastatic prostate cancer, which "had spread to his brain when it was diagnosed in mid 2001", by which time Waddell "had a stage four prostate cancer" (TR-1, 10).  Treatment thereafter was "palliative", i.e., not designed to cure his cancer, but rather to comfort him.

**1.      The Standard of Care: Cancer Screening**

Dr. Singer testified that although Waddell was asymptomatic for prostate cancer in September 2000, December 2000, or January 1999 (TR-1, 11), patients with prostate cancer should be treated before they begin experiencing symptoms.  He articulated the following standard of care for "P.S.A. testing for a sixty-five year old man":

> [T]he standard of care adopted by most societies is . . .  the
> patient be told that there are problems associated, false positives

---

[16]See PX-8.

[17]Dr. Singer was offered as an expert.  He is an oncologist to whom "patients with blood disorders in the area of hematology" are referred.  Approximately 75% of his practice consists of patients with cancer (TR-1, 7), but "under 5%" of them have prostate cancer (TR-1, 81).   His patients suffer mostly from breast, lung, and colon cancer (TR-1, 82).  He testified based on his education, training, and practice experience (See. TR-1, 7-10).   Before testifying, Dr. Singer reviewed all of Waddell's TR-1eatment records at the V.A., including records pertaining "mainly . . . . [to] his prostate cancer and his treatment" (TR-1, 10).   He also reviewed depositions of the treating physician, other experts who reviewed records, and depositions of Waddell's family members (TR-1, 10).  At the time of the trial, Dr. Singer had not testified in another prostate cancer case in three years (TR-1, 84).

> false negatives, but that basically the test can be used in
> conjunction with the D.R.E. which is the digital rectal exam to
> diagnose prostate cancer as early as possible.  And our whole
> purpose in treating cancer and in treating patients is to diagnose
> its most treatable.  And if the patient is agreeable and the
> institution follows these rules, then the patient would get a
> P.S.A. and a D.R.E. done yearly.  And that would be the
> standard.

(TR-1, 12-13).[18]  P.S.A. testing is not mandatory; it is explained to the patient as an option,

and if the patient agrees, annual testing is done.  The patient, however, may refuse the tests

(TR-1, 41).  Indeed, Dr. Singer agreed that the American Society of Clinical Oncology has

not issued any recommendations to physicians about prostate cancer screening (TR-1, 42).


### 2.    The VA's Standard of Care

According to Dr. Singer, it was the standard of care at the VA that, in treating a sixty-

five year-old man, the physician should advise the patient that a P.S.A. test and a digital

rectal examination can be performed on an annual basis (TR-1, 14, 42).[19]  He further stated

that the hospital's failure to perform the P.S.A. and other laboratory tests in September 2000,

December 2000, and January 2001 was a breach of its policy on prostate screening (TR-1,

17), and had Waddell been given P.S.A. tests on those dates, the results

---

[18]Dr. Singer explained that a poorly differentiated cancer grows considerably faster than a
well differentiated cancer, which "develops over eight or ten years" (TR-1, 22).  The former type
"spread more aggressively" and "cause death sooner if they're not treated" (***Id.***).

[19]PX-1 reflects that no P.S.A. test was done in September 2000.  Dr. Singer's opinion
regarding the Montgomery VA Hospital's policies was not based on a review of the hospital's
policies.  In fact, he did not review the policy, basing his opinion instead "on [Dr. Islam's]
statement that they did yearly P.S.A.'s" (TR-1, 43).

> [w]ould have been elevated and progressively so.  Not as
> elevated as the fourteen hundred found in July [2001], but I
> believe there would have been some elevation to indicate that he
> had a prostate cancer.

(TR-1, 18).  Dr. Singer acknowledged, however, that if Waddell were notified of the

appointments for laboratory tests on the three occasions above and failed to appear, the VA

Hospital did not violate its policy (TR-1, 58-59).

Patients are not routinely advised that they should have P.S.A. tests, "like you do a

colonoscopy and mammogram" (TR-1, 28).  Instead, "most organizations" recommend that

once the patient is advised about the P.S.A., and "if a patient want to have the test done

regularly, it should be done because it is helpful" (TR-1, 29).  In fact, the incidence of death

from prostate cancer has not decreased because of P.S.A. testing (TR-1, 29).

Throughout his testimony, Dr. Singer conditioned his declaration of the propriety   -

even the requirement -  of annual prostate screenings upon the patient's agreement that they

be done.  He stated, for example, that the VA should have continued P.S.A. testing "on a

yearly basis if the patient was agreeable to it" (TR-1, 42), but admitted that his opinions were

not based on a review of the policies of the Veteran's Administration or its hospital system:

> I have not reviewed the policy of the hospital or the VA.  Except
> the doctor in his deposition stated it was their policy at the V.A.
> I'm basing it on his statement, that they did yearly P.S.A.
> screening and D.R.E. screening.  That's all I'm saying.

(TR-1, 43).  For example, he did not review V.A. Directive 97-050 which is entitled ***National

Cancer Strategy*** (***Id.***).   Dr. Singer agreed that the following statement from the Directive

was valid:

> The value of any screening practice is demonstrated by the extent to which it has been confirmed to reduce morbidity and more at that time.  Prolongation of survival is insufficient evidence to support screening since earlier diagnosis results in longer survival whether or not early treatment or any treatment is effective.

(TR-1, 44).  The following exchange clarified the nature of Dr. Singer's reliance in articulating his opinions:

> MR. NEELEY: What piece of literature, what treatise, learned treatise, what study, what anything in the medical literature upon [which] you rely for your assertion that screening on P.S.A. test in this case would have increased Mr. Waddell's term of life?

> DR. SINGER: Well, I'm basing it on my knowledge as an oncologist and the type of cancer that he had.  Now as I said earlier, in most prostate cancers six or nine months means nothing.  Mr. Waddell's cancer was a very specific type.  It was an aggressive type that obviously progressed in a very short time.  So in his case in my opinion it would have made a difference.

With respect to whether the V.A.'s standard of care was specifically violated in Waddell's treatment, Dr. Singer acknowledged the priority he accorded to the advice given to the patient, rather than the actual administration of the P.S.A.  He further acknowledged the existence of studies which indicate that the incidence of death among screened and unscreened men is the same (TR-1, 69).

### 3.    Treatment of Waddell's Cancer

Dr. Singer believed that Waddell has "a poorly differentiated prostate cancer that was growing rapidly" (TR-1, 18).  Waddell's P.S.A. was 1.4 in August 1998, and it increased to

more than 1400 by 2 July 2001.  According to Dr. Singer, "the cancer was growing in between that time", and P.S.A. tests administered in September and December 2000 and January 2001 would have revealed that Waddell had prostate cancer (TR-1, 19).   A diagnosis in September 2000[20] would likely have led to "definitive treatment which would be a prostatectomy in most cases";[21] a diagnosis in December 2000 "would have been treated with radical surgery or radiation", and, if he had metastatic disease"by that time, he "would probably have been treated with hormone therapy" (TR-1, 20).

Dr. Singer did not believe that Waddell's cancer had metastacized to his brain by January 2001, though perhaps the cancer had spread beyond the prostate to his bloodstream or his bones (TR-1. 20).[22]  Thus, according to Dr. Singer, an MRI of the brain in January 2001 "would have been negative", and, with appropriate treatment (hormone therapy), Waddell could have avoided metastasis to his brain.

> Certainly he may have succumbed to his prostate cancer eventually because stage four disease is incurable, but without brain metastasis, in my opinion his survival would have been considerably longer.

---

[20]Dr. Singer thought that Waddell's cancer was at stage three in September 2000 (TR-1, 24).

[21]The surgical removal of the prostate gland.

[22]Dr. Singer had no doubt that Waddell's cancer originated in his prostate gland and that the chances were "[a]lmost zero" that the cancer that spread to his brain originated somewhere else (TR-1, 21).

(TR-1. 20-21).[23]    However, by the time the cancer spread to Waddell's brain, "there was absolutely no chance to treat him effectively" (TR-1, 24).

In any case, Waddell had "a very aggressive prostate cancer", which, although absent in 1999, "developed rapidly over a year and a half" (TR-1, 20).  However, patients with stage four cancer can live for years "[i]f it's treated early" (TR-1, 24).

> [T]he problem with treating cancer is that the longer cancer grows, the more cells are in the boy and the effectiveness of hormone or chemotherapy is much less because the tumor burden is much bigger.  When the tumor is small, patients can do very well and live a long time, several years with it.  Whereas if you have stage four disease and the tumor has large masses everywhere in the body, the likelihood of long-term survival is much less.

(TR-1, 24-25).[24]   Thus, had Waddell begun treatment in September 2000, "he would have lived beyond September 15, 2002 by at least a few years" (TR-1, 26).

As for Waddell's quality of life after his diagnosis, Dr. Singer stated that he "had radiation therapy to the head . . . , hormone therapy and . . . . chemotherapy".  He also had "several admissions for dehydration and pain" and "died a little over a year later" (TR-1, 36).  Early diagnosis would have avoided metastasis of the cancer to Waddell's brain, and in the absence of the brain tumor, Waddell would have enjoyed a better quality of life.  Although

---

[23]Waddell's cancer also "spread to his spine, some other bones and . . . some areas of his pelvis" (TR-1, 21).

[24]The term "stage four" means "that the cancer has spread to other areas in the body" (TR-1, 25).  If the cancer spreads to "a few areas in the bone, the patient can live with that a long, long time.  If it spreads however to a vital organ like the brain or the liver, then the patient is unlikely to live a long time.  So it's the site that's very important" (TR-1, 25).

Waddell may not have been cured, "he certainly would have lived longer" (TR-1, 37), perhaps as long as three years.[25]   Finally, with proper screening and treatment, Waddell may not have died from prostate cancer (TR-1, 96).

### D.    The Defendant's Expert Analysis of Waddell's Treatment

Dr. Otis W. Brawley ["Dr. Brawley"], the defendant's expert, is a medical oncologist and epidemiologist; he is a professor in the School of Medicine at Emory University (TR-2, 78).[26]   As a physician in Emory hospital's clinic, he sees only patients which prostate or breast cancer (TR-2, 99-100).  He is also a member of the American Society for Clinical Oncology's cancer prevention committee, which is charged with examining issues of "cancer prevention [and] cancer screening" (TR-2, 88).

Like Dr. Singer, Dr. Brawley reviewed Waddell's medical records from Flowers Hospital and the VA Hospital (TR-2, 135; DX-14 through 17).[27]   He did not review Dr. Islam's deposition before he testified at trial (TR-2, 159).

----

[25]Dr. Singer's opinion was not based on a study or treatise; instead, he based his opinion "on [his] knowledge as an oncologist and the type of cancer that [Waddell] had" (TR-1, 51).  His vita, PX-8, reflects his certifications and his clinical experience, but no research, clinical studies, publications, or participation in clinical trials.  His most recent presentation   - one on leukemia - was made in April 1971.

[26]Dr. Brawley is board certified in medical oncology and has published a chapter in  a medical textbook on the screening and diagnosis of cancer, entitled *Cancer Prevention and Control*, as well as articles dealing with health outcomes in cancer (TR-2, 82-85).

[27]Before the trial of this case, Dr. Brawley had never served as an expert witness in court; nor had he ever given a deposition (TR-2, 155-156).

1.      **The Standard of Care:  Cancer Screening**[28]

Dr. Brawley is familiar with the standard of care applicable to internists in the diagnosis and treatment of prostate cancer.   As the basis for his familiarity, he stated:

> [I]t's what I've spent most of my research as well as teaching time over the last and administrative and policy time over the last fifteen years doing.  I've spent more time on prostate cancer issues than any other.  .  .  .  At Emory University the private patients I take care of only have prostate or breast cancer.

(TR-2, 137).   In his opinion,

> [T]here is no real standard of care right now in terms of prostate cancer screening.  That it's acceptable for a physician not to do it.  It's acceptable for a physician to do it.  I have written that if a physician chooses to do it, I would hope that physician would inform the patient of the potential risks as well as the potential benefits of screening and treatment thereafter.

(TR-2, 138).

Dr. Brawley's opinions were supported by and based upon his professional medical practice, his academic status at a teaching university, his publications, his review of clinical studies, his professional associations, and his previous experience.[29]  He previously headed a committee for the Surgeon General that examined cancer issues, during which time he

---

[28]Dr. Brawley testified that all of his opinions regarding the standard of care were expressed to a reasonable degree of medical certainty (TR-2, 142).

[29]In addition to the certifications and clinical experience reflected on Dr. Brawley's vita, DX-4, it also reflects research experiences, scientific activities, and published papers.  He was the coordinator for the National Cancer Institute's Prostate Cancer Prevention Trial from 1993 to 1996, and he has published numerous papers focused on the prevention of prostate cancer and the treatment of prostate cancer.  He has also co-authored book chapters on cancer prevention and prostate cancer therapies.

"maintained a list of 18 organizations that as of 2000 had spoken on the issue of prostate cancer screening" (TR-2, 91).  Of those 18 organizations, only three were "somewhat friendly towards screening" (TR-2, 92).  He added that

> those three organizations actually said in general that screening should be offered, men should be informed of the potential risks and potential benefits and men should be encouraged to make a choice.

(*Id*.)  He later added that the other 15 organizations recommended against screening because there were no clinical trials that demonstrated that screening saves lives (TR-2, 134).

Dr. Brawley acknowledged that in 1993, the American Cancer Society "recommended that men get screened with a digital rectal exam and the prostate specific antigen [P.S.A.]" (TR-2, 93), but  in 1997, he was a member of a group that advised the American Cancer Society to change its recommendation.    Thereafter, the society changed its recommendation.[30]

More specifically, Dr. Brawley described a proposal by Emory University Hospital to conduct free prostate cancer screening for 1000 men at "a mall on a Saturday morning" (TR-2, 101).   According to the scientific literature, if such screening were done, approximately 45 to 50 of the men would be diagnosed with prostate cancer, because several scientific studies have revealed that approximately 15% of all men between 50 and 70 who are screened have an abnormal P.S.A. or digital rectal exam, and between four and a half and

---

[30]According to Dr. Brawley, the American Cancer Society "had recommended prostate cancer screening three months after receiving a donation from the largest P.S.A. manufacturer in the United States", i.e., Abbot Laboratories (TR-2, 95).

five percent will be diagnosed with prostate cancer (TR-2, 105).  However, "no one knows if prostate cancer screening saves lives" (TR-2, 103).

As an example, Dr. Brawley stated that "men in their fifties and sixties in the states of Washington are more likely to be screened than men in their fifties and sixties in the state of Connecticut".  However, the death rate for prostate cancer among men in Washington is far higher than the death rate from prostate cancer in Connecticut (TR-2, 130).  In addition, the death rates in the respective states remained "the exact same over thirty years" (TR-2, 131).

In the United Kingdom, "prostate cancer screening is almost illegal to do because it hasn't been proven to save lives" , and

> [t]he incidence rate of prostate cancer in the United Kingdom is less than half the incidence rate that it is in the state of Washington.   But in all three areas the death rate over the last thirty years for white men has been the exact same.  So you can use that kind of count to show that you can identify a group of men who have prostate cancer, but those men actually don't need to be identified and don't need to be treated.  And one can say who's better, a Brit [who] doesn't get screened and has the same risk of death from prostate cancer, or a resident of the state of Washington who does get screened and again has the same risk of prostate cancer as that Brit, but actually has what actually ends up being a fifteen times greater risk of getting a radical prostatectomy which is that operation with a one, one and half percent death rate?

(*Id*.)

Further, on the issue of the usefulness of prostate cancer screening, the following pertinent exchange occurred:

THE COURT: [I]s there anything about either screening or treatment that would affect [the growth or malignancy of prostate cancer]

DR. BRAWLEY: No, ma'am.  And those fifteen organizations that have looked at the data and have either said we cannot recommend prostate cancer screening or we recommend against prostate cancer screening are actually saying no to that very question.

THE COURT: Is it your medical opinion that Mr. Waddell's prostate cancer could have been detected before it moved beyond his prostate gland?

DR. BRAWLEY: The answer to that question is it likely could not have been detected before it moved beyond his prostate gland.

Dr. Brawley agreed that a hospital's standard of care can be violated by the institution's failure to follow its own policy (TR-2, 165), but the V.A.'s policy (DX-17) requires the V.A. to "utilize screening practices which have been shown to be evidence based" (TR-2, 174).


2.      **Effect of Treating Prostate Cancer**

Dr. Brawley described the treatments for prostate cancer and generally observed that complications from those treatments substantially affect the patient's quality of life.  In fact, studies support the conclusion that 3.3% of men in the United States die from prostate cancer (TR-2, 107), but seven out of eight of men diagnosed with prostate cancer "would have been

better off not knowing they had it" (TR-2, 108).[31]   The reason, he explained, "is the treatments".

Surgical removal of the prostate   - a prostatectomy -   can lead to death from the surgery itself, including reactions to anesthesia and blood clots, but the risk, 1 ½%, is small (TR-2, 109-110).  However, the impact of the surgery on a man's quality of life is extreme. Recovery is long   - more than six months - for most men, and many men experience urinary and sometimes fecal incontinence, leading many of them to wear diapers (TR-2, 111).

In addition, approximately 5% of men who have their prostates surgically removed develop "colostomy because of rectal damage" resulting from the incision (TR-2, 116).  As a result, the patient "has to defecate through a pouch" temporarily, and sometimes permanently.  The surgery also carries a risk of peritonitis, a bacterial infection of the abdominal cavity which can be fatal (TR-2, 117).   Although Dr. Brawley recognized chemotherapy as an available treatment, he stated that "only about twenty percent, one in five individuals, with widely metastatic prostate cancer, ever gets chemotherapy" because "[i]t's not really been shown to work" (TR-2, 123).


3.     Treatment of Waddell's Cancer

---

[31]Dr. Brawley later explained his reason for that conclusion.  "We now have technologies that allow us to identify . . .  individual[s] as having prostate cancer . . . [O]ne of the problems in prostate cancer is we actually cure a group of men who yes they have cancer but they do not need to be cured of that cancer.  And the worst thing that we can actually do is label them a cancer patient because of the emotional hardships of that, as well as give them all of these treatments, many of which are not necessary" (TR-2, 130).

Based upon his examination of the same medical records of Waddell's that were submitted to Dr. Singer, Dr. Brawley "found no violations of the standard of care" (*Id.*). As for violations of the standard of care  regarding prostate cancer screening in particular, he found "[n]one whatsoever" (*Id.*).   When asked whether screening Waddell in late 2000 or early 2001 would have detected prostate cancer, although Dr. Brawley acknowledged that screening "probably would have shown it", he added that no one knows for sure (TR-2, 139).

Dr. Brawley's opinion was based upon his review of papers and studies that examine a phenomenon called "P.S.A. velocity".  Accordingly, he stated that Waddell likely had metastatic cancer in December 2000, because it is "very unusual for someone's P.S.A. to get well over a thousand in just six months" (TR-2, 141).  Because Waddell had a "normal P.S.A." in January 2000 when he was screened at the VA Hospital in Florida, his disease progressed rapidly during the next 12 to 18 months (*Id.*).

Dr. Brawley discounted the value of a digital rectal examination in detecting cancer.

> All a D.R.E. would detect is an enlarged prostate or a nodule, an abnormality in the contour of the prostate.   The enlarged prostate is not a cancer, usually it's a benign condition.  Having a nodule can indicate a cancer, but it doesn't necessarily indicate a cancer.

(*Id.*).  Moreover, according to Dr. Brawley, a D.R.E. can actually increase the P.S.A., but if one or both tests yield abnormal results, "the standard of care is to do a biopsy of the prostate" (TR-2, 142).

He therefore acknowledged that a P.S.A. test performed on Waddell in December 2000 or January 2001 would have yielded results "in the several hundred range", leading him

22

to conclude "a likely metastatic cancer" (*Id.*).    However, based upon his understanding of

P.S.A. velocity, Dr. Brawley stated that the patients with the worst prognosis of surviving

prostate cancer are those "whose disease crops up in between scheduled screening[s]" (TR-2,

144).

> Those people have cancer which is highly aggressive and very
> fast growing.  One of the great difficulties we have in cancer
> right now is we have technologies that can identify the slower
> growing tumors and frequently in prostate cancer a lot [of them]
> cure men who don't need to be cured.  We do not have adequate
> technologies to pick up these fast growing tumors.  .  .  .
> Those are the patients who die from this disease.

(TR-2, 145).  Waddell, according to Dr. Brawley, was in the latter category.  In patients with

fast growing tumors,  "literally nothing in terms of treatment works", and there is not

> a single study that definitively shows that the treatment of
> metastatic widely metastatic prostate cancer actually does
> anything in terms of making someone live longer.  The reason
> why we treat widely metastatic prostate cancer is that it
> decreases the symptoms while that person is alive.

(TR-2, 146-147).

Had Waddell been Dr. Brawley's patient, he would not have started hormonal

treatment until he learned that the cancer had become widely metastatic, i.e., when there were

symptoms.  Waddell presented with symptoms when his brain tumor was detected at Flowers

Hospital in Dothan on 26 June 2001 (TR-1, 26, 32, 160).    Although he had undergone no

P.S.A. screening since August 1998 (which yielded a result of 1.4), Dr. Brawley opined that

had he been screened during the six months before June 2001, its only benefit would have

been to "give Mr. Waddell six months of knowing that he had prostate cancer and we were

23

watching it and not doing anything about it" (TR-2, 146).[32]

Regarding the impact of more frequent prostate cancer screening on the *length* of Waddell's life, Dr. Brawley acknowledged that "screening him earlier would have prolonged his survival, which is time from diagnosis to death.[33] But I'm predicting that his death would have been at the exact same time that it actually was" (TR-2, 152).[34]

## II.   DISCUSSION

### A.   *Jurisdiction*

The parties stipulate that this court's jurisdiction pursuant to the FTCA, 28 U.S.C. § 2671 - 2680,[35] has been properly invoked, and that the plaintiff has exhausted administrative remedies.[36]  Waddell's death during the course of this litigation, however, has had an impact

---

[32]A process that Dr. Brawley described as "observational therapy" (TR-2, 150).

[33]In fact, in a study done by David Crawford of the University of Colorado, beginning in 1992, in which 72,000 men were involved, 36,000 of them were screened and 36,000 were not screened.  The study concluded that "men who have a normal P.S.A., that is less than four, do not have substantially greater benefit if screened every two and a half years versus screened every year."  9TR-2, 182).

[34]Dr. Brawley was not quite that certain when he gave his deposition.  There, when faced with the same question, he responded, in pertinent part, that he could "not answer that question for a specific patient" (TR-2, 159).

[35]See note 1.  Moreover, Pearson-Heffner, as Waddell's personal representative, is the appropriate person to pursue this action under Alabama's wrongful death statute.  ***Hatas v. Partin***, 175 So.2d 759, 760-61 (Ala. 1965); ***Abner v. Mobile Infirmary Hosp.,*** 149 Fed. Appx. 857, 858 (11th Cir. 2005).

[36]Waddell submitted a personal injury claim to the United States for investigation on 22 January 2002 in the amount of $10,000,000.00.  His claim was denied on 3 May 2002.

upon the plaintiff's invocation of the court's jurisdiction.  When the complaint was filed in Waddell's name, he invoked the FTCA and charged the United States with negligence which led to his pain and suffering.  After September 2002, the new plaintiff, Pearson-Heffner, as executrix of Waddell's estate, added a claim for wrongful death.

The plaintiff contends that, notwithstanding Waddell's death, she may still pursue a cause of action for negligence as well as a cause of action for wrongful death.  The plaintiff is correct.  Alabama's Wrongful Death Act no longer operates to extinguish an action that has been filed to recover for personal injuries, where those injuries later result in death. *Jones v. DCH Health Care Auth*., 621 So. 2d 1322 (Ala. 1993).  However, the court's determination that the plaintiff is entitled to no relief on either of her claims pretermits a determination of separate damages for negligence *and* for wrongful death.

**B.**     ***The Parties' Contentions***

The plaintiff has constructed a "domino" argument based on her contentions regarding the V.A.'s standard of care and breach of that standard by Waddell's providers.  According to the plaintiff, (1) had the V.A. administered a P.S.A. to Waddell annually, his cancer would have been detected earlier; (2) had it been detected earlier, he could have been treated earlier and more effectively; and (3) had he been treated earlier and more effectively, he would have avoided the pain and suffering that he endured and he would have lived longer.  In fact, the plaintiff alleges that Waddell "was deprived of longevity and was deprived of the opportunity to have his cancer effectively treated" (Doc. 53).     The plaintiff contends that the V.A.

maintained a policy and standard of care of administering annual P.S.A. tests and that by breaching that standard of care, it caused Waddell to be injured.

The United States alleges that the V.A.'s standard of care was not breached and that there is no direct or proximate causal link between Waddell's injuries and death and the care that he received at the V.A.  The government further contends that, even if there were a direct or proximate causal link, Waddell is barred from recovering because (1) he was contributorily negligent, and (2) he assumed the risk that his cancer would not be detected.

**B.**    ***Standard of Analysis and Controlling Law***

**1.**    **State Law**

The FTCA specifically requires that the government's liability be determined "in accordance with the law of the place where the act or omission occurred", in this case, the state of Alabama. "[T]he court must apply the appropriate law of the forum state to determine liability". ***Lauderdale v. U.S.***, 666 F.Supp. 1511, 1514 (M.D. Ala. 1987); ***Kitchens v. United States***, 604 F.Supp. 531, 534 (M.D. Ala. 1985).  The pertinent Alabama statute, the Alabama Medical Liability Act, provides:

> In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community.

§6-5-484, *Code of Alabama*, 1975.[37]

The Alabama Supreme Court has interpreted the "same general neighborhood" to mean "the national medical community". *See **Lauderdale v. U.S.**, supra*, citing ***Lamont* v. Brookwood Health Services**, 446 So. 2d 1018 (Ala. 1983); ***May v. Moore***, 424 So. 2d 596, 600 (Ala. 1982); ***Drs. Lane, Bryant, Eubanks & Delaney v. Otts***, 412 So. 2d 254, 257-58 (Ala. 1982).

Thus, to prevail in this case, the plaintiff must prove, by a preponderance of the evidence, that the United States, through its employee physicians, failed to exercise such reasonable care, diligence and skill as physicians in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. Moreover, she must prove that the V.A. hospital failed to use that degree of care, skill, and diligence used by hospitals generally in the community.[38]

## 2.    Federal Law

Although the FTCA provides the substantive basis for the plaintiff's claim and the paradigm for analysis of her proof (inasmuch as the parties relied almost exclusively on expert testimony), resolution of the issues in this case also rests substantially upon the court's

---

[37]Curiously, the plaintiff never mentioned the Alabama Medical Liability Act in her pretrial brief or her post-trial brief.  Although she cites authorities that interpret the statute, her analysis has not been expressly subjected to the requirements of the statute itself.

[38]Neither party offered any evidence of the care, skill, and diligence used by hospitals generally in the community" of the Montgomery V.A. hospital.

admission of expert evidence under Rule 702 of the FED. RULES OF EVID.,[39] and upon the

Supreme Court's pronouncements in its trilogy of cases  which now govern admission of

expert evidence in federal courts.  *Daubert v. Merrell Dow Pharmaceuticals*, Inc. 509 U.S.

579 (1993); *General Electric Co. V. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co. v.*

*Carmichael,* 119 S. Ct. 1167 (1999).    In *Daubert*, the Supreme Court held that expert

testimony could be admitted only if the district court deemed it both relevant and reliable.

*See* *United States v. Scheffer*, 523 U.S. 303, 312 (1998).

Applying *Daubert's* "standard of evidentiary reliability", 509 U.S. at 590, the court

must closely examine the expert evidence and, in fulfillment of its obligation to act as

"gatekeeper", it must filter the evidence to determine its overall usefulness.   Reliability

implies

> "a valid . . . connection to the pertinent inquiry as a precondition
> to admissibility." 509 U.S. at 592. And where such testimony's
> factual basis, data, principles, methods, or their application are
> called sufficiently into question .   .   . the trial judge must
> determine whether the testimony has "a reliable basis in the
> knowledge and experience of [the relevant] discipline." 509 U.S.
> at 592.

*Kumho Tire Co. v. Carmichael*, 526 U.S. at 149-150.  The factors that influence a judge's

---

[39]Rule 702. Testimony by Experts:  If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or education, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness
has applied the principles and methods reliably to the facts of the case.

gatekeeping determination include:

1.      Whether a "theory or technique . . . can be (and has been) tested";

2.      Whether it "has been subjected to peer review and publication";

3.      Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

4.      Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

**Kumho Tire Co. v. Carmichael**, 526 U.S. at 149-150, citing **Daubert**, 509 U.S. at 592-594; **Dukes v State**, 428 F.Supp. 1298, 1309 (11th Cir. 2006).

Thus, consistent with applicable federal law governing the admissibility of expert evidence, to prevail, the plaintiff must introduce probative expert evidence that is both relevant and reliable, as further defined by the aforementioned considerations .


**C.      Analysis of Expert Testimony**

The two critical factual inquiries that the court must pose and resolve, in the context of evaluating expert evidence in this case, are:

1.      What was the standard of care that governed the administration of P.S.A. screening tests at the V.A. hospital?

2.      What was the relevant and reliable evidence offered at trial that the V.A. hospital breached or violated the standard of care?

Because "the burden of laying the proper foundation for the admission of expert testimony rests with its proponent", in this case, the plaintiff, the court's analysis is focused upon the plaintiff's expert, Dr. Singer.  ***Dukes v. State***, 428 F.Supp. at 1309; ***Cook ex rel. Estate of Tessier v. Sheriff of Monroe County***, 402 F.3d 1092, 1113 (11th Cir. 2005).  As always, the determination of the evidentiary reliability of testimony should be based on the methods used to reach the conclusions articulated, not on the conclusions themselves.

**1.    Standard of Care at the Veterans Administration Hospital**

   *a.    Dr. Islam's Testimony*

The plaintiff made several attempts at the trial to elicit from Dr. Islam, who was not qualified as an expert, a statement of the standard of care at the V.A. hospital for prostate cancer screening.  First, she asked the question directly, referring to a "policy" for prostate cancer screening; Dr. Islam stated that he wasn't "exactly sure of the policy" (TR-1, 103).  In response to the same question at his deposition, he made a statement upon which the plaintiff relies as an articulation of the V.A.'s standard of care for P.S.A. testing:

>  We check an annual exam for prostate cancer screening colorectal cancer and screening.

(TR-1, 104).

When asked again at trial whether the V.A. had a policy on prostate cancer screening, Dr. Islam replied:

>  No .  .  .  .   What I know from my understanding that we educate the patient and we also do P.S.A. check, rectal exam

> check annually with the patient.  But is that a specific protocol?
> That I'm not sure.

(TR-1, 116).

He was then asked a specific question about the standard of care for prostate cancer screening for men between ages fifty to seventy at the V.A..  He responded:

> We do our P.S.A. prostate screening, education and we do
> P.S.A. also.

(TR-1, 117).  The plaintiff then made one final attempt to secure Dr. Islam's statement of the policy by asking whether failure to follow the protocol constituted a breach in the standard of care.  Again, Dr. Islam provided an answer that was at best equivocal:

> I'm not sure if that's a protocol or not.  That's what I'm not
> sure.

(TR-1, 118).


      *b.*    *Application of Alabama Law to Dr. Islam's Testimony*

Analysis of proof in this FTCA case is governed by Alabama law.  ***United States v. Muniz***, 374 U.S. 150, 162-163 (1963).  To prevail in a wrongful death action against a hospital, the Alabama Medical Liability Act  requires that Pearson-Heffner establish (1) the appropriate standard of care, (2) that the V.A. hospital failed to comply with that standard of care, and (3) that the V.A.'s failure to comply proximately caused Waddell's wrongful death. See § 6-5-542(2), ***Code of Alabama***, 1975; ***Jackson v. Pleasant Grove Health Care Ctr.***, 980 F.2d 692, 695 (11th Cir. 1993).

In addition, the plaintiff must ordinarily offer expert testimony as to the appropriate standard of care. *Jackson v. Pleasant Grove Health Care Ctr.*, *supra*, citing *Rosemont, Inc. v. Marshall*, *supra*; *Parrish v. Spink*, 284 Ala. 263, 224 So. 2d 621 (1969).   Alabama law also requires a plaintiff to present expert testimony to establish the breach of the applicable standard of care by the defendant health care provider.  § 6-5-548, *Code of Alabama*, 1975; *Rosemont, Inc. v. Marshall*, 481 So. 2d 1126 (Ala. 1985); *Jones v. Bradford*, 623 So. 2d 1112, 1114 (Ala. 1993).   The plaintiff must also prove by expert testimony that the breach proximately caused the injury.   *University of Alabama Health Services Found., P.C. v. Bush*, 638 So. 2d 794 (Ala. 1994); *Malcolm v. King*, 686 So. 2d 231, 237 (Ala. 1996).

The only exceptions to the requirement of expert testimony are (1) where a foreign instrumentality is found in the plaintiff's body following surgery; (2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; (3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and (4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct. *Jones v. Bradford*, 623 So. 2d. at 1115.  None of these exceptions apply in this case.

Therefore, the court cannot consider Dr. Islam's testimony on the standard of care because he did not testify as an expert.  The plaintiff never advised the court of the defendant that she intended to offer Dr. Islam as an expert, she never qualified him as an expert, and

none of the testimony elicited from him justifies that conclusion.[40]

Even if he had been qualified as an expert or had testified based upon his expertise, his statements regarding the standard of care for prostate cancer screening were so muddled that they are insufficient to support any conclusions about the standard of care at the V.A. hospital.  None of Dr. Islam's responses included the words "policy" or "standard of care", and the only time he used the word "protocol" was to express his uncertainty whether his practices constituted a protocol.

Indeed, close review of Dr. Islam's testimony discloses that he discussed practices, not policies.  In other word, he simply explained the steps that he and perhaps other doctors at the V.A. may undertook to screen for cancer.  Not one time did he designate any of those practices as having been dictated by an official V.A. standard of care.  Indeed, there are three other material factors that undermine the plaintiff's attempts to establish a standard of care for prostate cancer screening through Dr. Islam.

First, Dr. Islam is not an oncologist, nor does the evidence establish his experience in the treatment of cancer patients generally or prostate cancer patients especially.  Upon consideration of his entire testimony, the court is left with grave doubts about his expertise in the treatment of cancer.  Those doubts are buttressed most alarmingly by his response to the simple question: "What does the P.S.A. test do, please?".   His answer was less than pedestrian: "It basically tells about the prostate" (TR-1, 105).

---

[40]In fact, during the trial, plaintiff's counsel asked the court for permission to treat Dr. Islam   - her chief witness on the standard of care -   as a hostile witness!  (TR-1, 100).

Second, his testimony made clear that, although he used the term "annual" during his testimony, in his treatment of Waddell and other veterans  - including screening tests -  he assigned no particular significance to the concept of "annual examination".  When plaintiff's counsel asked Dr. Islam whether the treatment that Waddell received on September 2000 an "annual exam", he replied:

> I don't know what's that.  I mean annual physical exam  - it's nursing but it's not anything with me.  I don't know.   .   . That's not my annual physical exam.  I don't know how it became annual physical exam because nursing doesn't do physical exam.

(TR-1, 106).[41]    The thrust of Dr. Islam's testimony is that, at the V.A. hospital, the term "annual" is grounded more in administrative organization than in medical necessity.  The testimony is critical inasmuch as Pearson-Heffner argues that annual P.S.A. testing is material to the alleged standard of care at the hospital.

The third reason why Dr. Islam's testimony factually compromised plaintiff's proof of an identifiable standard of care for prostate cancer screening is his strong suggestion that prostate cancer screening was an individual decision, from doctor to doctor.

> It depends on the physician.  The physician on his clinical judgment orders the test, they do the prostate screening.  But what I am saying, usual at age fifty we do educate the patient about the prostate screening.

---

[41]In response to subsequent questioning to determine if Dr. Islam could identify an annual examination from looking at the V.A.'s medical records, the plaintiff showed him a copy of PX-36 (the medical record of Waddell's visit to the V.A. in March 2001) and asked him if it was a record of an annual exam.  In response, Dr. Singer answered, "I cannot tell that, if that's an annual exam or not".  If Dr. Singer cannot state, upon examining a V.A. document, that it recorded an "annual examination", then neither can the plaintiff or Dr. Singer.

(TR. 1-, 118).  Finally, when the court asked specifically whether the V.A. required him to do prostate cancer screenings, Dr. Islam said: "*No. It's not the mandate or requirement*". (TR-1, 119) [Emphasis supplied].

Thus, the court finds that Dr. Islam's testimony regarding the standard of care at the V.A. is inadmissible because he did not testify as an expert, he is not an expert, and, in any case, his testimony was factually insufficient to establish a standard of care at the V.A. hospital in Montgomery.

### c.      *Application of Alabama Law to Dr. Singer's Testimony*

Dr. Singer also attempted to articulate a standard of care  -  first, a general one, then one applicable to the V.A. hospital.  His second effort, i.e., the V.A.'s standard of care, was based upon his review of Dr. Islam's deposition.[42]   If Dr. Islam's evidence of the standard of care at the V.A. is inadmissible and insufficient for the aforestated reasons , both because of his status and his equivocation, then Dr. Singer's testimony about the standard, hoist upon Dr. Islam's, is similarly inadmissible and insufficient.[43]

---

[42]Dr. Singer said that he had also reviewed the depositions of "other experts who reviewed the records", a reference to Dr. Brawley, but since Dr. Brawley strongly disagrees with Dr. Singer's pronouncement of the standard of care, the court finds that Dr. Singer's understanding of the V.A.'s standard of care is based upon Dr. Islam's deposition testimony.

[43]Pearson-Heffner's attempt to use Dr. Islam's deposition testimony for any purpose other than impeachment is inappropriate.  She clearly relied upon his deposition testimony in her case-in-chief (See the plaintiff's Post-Trial Brief, Doc. # 60, p. 2).  The court has not considered Dr. Islam's deposition testimony as probative evidence.  The court has considered that portion of his deposition testimony offered by the plaintiff to impeach him in determining the credibility and weight that should be assigned to his testimony.

Dr. Singer readily admitted that he had not reviewed the policy of the hospital or the V.A. and that he was basing his testimony regarding the standard of care on Dr. Islam's deposition testimony.  As he said: "That's all I'm stating" (TR-1, 43).  The failure of an expert to establish the standard of care results in a lack of proof essential to a plaintiff's medical malpractice case. ***Rosemont, Inc. v. Marshall***, ***supra***.  Evidence that Dr. Singer's testimony "tracked" Dr. Islam's is the former's acceptance of the latter's conclusion that P.S.A testing was not mandatory at the V.A.  In fact, Dr. Singer readily acknowledged, based upon Dr. Islam's testimony, that the screening process is routinely explained to the patient as an option, and if the patient agrees, annual testing is done.  The patient, however, may refuse the tests (TR-1, 41).  Absent the foundation of Dr. Islam's testimony regarding the standard of care, Dr. Singer's declaration of the standard becomes a mere opinion  - one that is insufficient under Alabama law to carry the plaintiff's burden of proof.  *See **Dobbs v. Smith***, 514 So. 2d 871, 872 (Ala. 1987); ***Pruitt v. Zeiger***, 590 So. 2d 236, 238 (Ala. 1991).[44]

The failure to prove a standard of care is fatal to the plaintiff's recovery.  The court, nevertheless, finds that, in this case, it is important to apply a ***Daubert*** analysis to the evidence.

> d.      *Application of Daubert to Dr. Singer's Testimony*

---

[44]Pearson-Heffner clearly relies upon Dr. Islam to articulate the V.A.'s standard of care. In her Memorandum In Opposition to the defendant's pretrial attempt to exclude Dr. Singer's testimony, Dr. Islam's deposition testimony is the sole evidentiary basis of her argument under the heading, ***This VA Hospital's Protocol*** (See Doc. # 57).

If the opposing party calls into question the expert witness's "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert,* 509 U.S. at 592.  It is therefore appropriate to subject Dr. Singer's testimony to the four factors outlined in *Daubert*.

Before the trial, the United States filed a motion *in limine* to exclude Dr. Singer's testimony on the ground that it would be inadmissible under *Daubert.*  The motion was based upon Dr. Singer's having stated that the bases for his opinions regarding the standard of care and the breach of the standard were (1) his professional experience, (2) the American Cancer Society, (3) The American Society of Clinical Oncology,[45] and (4) the American Urologic Association.

In her memorandum in opposition to the United States' motion, Pearson-Heffner stated that

> Dr. Singer testified based upon his background, education, training, and experience.  He also referenced at least two groups, the American Cancer Society and the American Urological Association, that recommend screening.

(Doc. # 57).  The court denied the defendant's motion to exclude the testimony, opting to consider all of the testimony at trial (Doc. # 59).  Having done so, however, the court now concludes that Dr. Singer's trial testimony regarding the breach of the standard of care fails

---

[45]Dr. Singer acknowledged that the American Society of Clinical Oncology has not issued any recommendations to physicians about prostate cancer screening (TR-1, 42).

to withstand the analytical rigors of *Daubert*.

    1.      Can his theory be tested, or has it been?

    2.      Has it been subjected to peer review and publication?

    3.      Is there a high "known or potential rate of error" in the use of this technique, and are there standards controlling the technique's operation"?

    4.      Does the theory enjoy "general acceptance" within a "relevant scientific community."?

*Daubert*, 509 U.S. at 592-594.[46]  Before analyzing each prong of the test, the court observes that Dr. Singer has not participated in any trials regarding P.S.A. testing or screening (TR-1, 80).

    Dr. Singer's testimony does not satisfy the first prong of the *Daubert* test.  When engaging in the reliability analysis, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. *Daubert*, 509 U.S. at 595.

> [T]he unremarkable observation that an expert may be qualified
> by experience does not mean that experience, standing alone, is
> a sufficient foundation rendering reliable any conceivable

---

[46]The Court of Appeals' articulation of the tests is that expert testimony may be admitted into evidence if (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

opinion the expert may express. As we observed in *Quiet Technology* [*DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003)], "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . Our caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

*United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

Dr. Singer's testimony  regarding the standard of care at the V.A. hospital, was not

based on principles and methodology; rather, they were conclusions based upon Dr. Islam's now discredited testimony and his personal experience.  Although he concluded that had Waddell been given P.S.A. tests in September 2000, December 2000, and January 2001, his cancer would have been diagnosed earlier, he offered no evidence of clinical studies, methodologies, or other empirical data to demonstrate the worthiness of his conclusion.  In other words, there was no evidence that his theory had been tested.

"[P]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the plaintiff's burden. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id*. at 1111 (internal quotations omitted).

The plaintiff's expert testimony in this case also fails the second prong of the Daubert

test.  Under this prong, the court must decide if the expert's testimony logically advances a material aspect of the proposing party's case." (**Id.**).  This prong is described as an issue of "fit" (**Id.**). and it is not satisfied if the proffered testimony does not assist the trier of fact. *See* FED. R. EVID. 702. Further, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." **United States v. Frazier**, 387 F.3d at1262-63.  The court's focus, in analyzing expert testimony, "must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595.[47] Because Dr. Singer's testimony was largely conclusory, it is not helpful.[48]

Dr. Singer never testified that his conclusions had been subjected to peer review. Without discussing studies or other scientific attempts to test hypotheses, he merely alluded to general policies espoused by three professional societies.  He acknowledged that "most organizations" recommend that once the patient is advised about the P.S.A., it should be done "if a patient wants to have the test done regularly" (TR-1, 29).  This is not evidence of peer

---

[47]Contrast, for example, Dr. Brawley's testimony regarding a Veterans Administration Cooperative Urology study that was begun in 1970 and its findings on the usefulness of prostate cancer screening (See TR-2, 150-151).  Significantly, Dr. Singer agreed that the incidence of death among screened and non-screened men is the same (TR-1. 69).

[48]For example, on the critical issue of causation, Dr. Singer rather casually testified that Waddell "may have succumbed" to prostate cancer "eventually", but "without brain metastasis, in my opinion his survival would have been considerably longer" (TR-1, 20-21).  Again, in the absence of even an allusion to scientific methodologies which demonstrate a likelihood of increased longevity with early diagnosis, Dr. Singer's testimony is not at all helpful, and true to the **Daubert** court's forewarning, it became fodder for the plaintiff's post-trial arguments (See Doc. # 57).

review.  When an expert cannot explain his assurances of the propriety of medical treatment, i.e., that it is based upon accepted principles, his testimony is not reliable.  *See **McClain v. Metabolife International, Inc**.*, 401 F.3d 1233, 1244 (11th Cir. 2005).

The plaintiff's expert proof fares no better under the third prong of the test.   Dr. Singer gave no evidence whatsoever regarding whether there was a  "known or potential rate of error" in the use of prostate cancer screening.  Nor did he provide any information about the "standards controlling the technique's operation".  Instead, he simply relied on his own experience to commend annual P.S.A.'s.  When a witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  ***United States v. Frazier***, 387 F.3d at 1261.  An expert's qualification and experience alone are not sufficient to render his opinions reliable. ***Id***.

Finally, the court cannot conclude from Dr. Singer's testimony that his theories enjoy "general  acceptance" within a "relevant scientific community."   His three theories were (1) the  general  standard  of  care  and  the  V.A.'s  standard  of  care  regarding  prostate  cancer screenings is that men who are sixty-five and older be screened annually (TR-1. 14. 42), (2) the  V.A. hospital's failure to screen Waddell annually violated the standard of care (TR-1, 17), and (3) the breach of the standard caused Waddell increased pain and suffering and hastened his death by "at least a few years" (TR-1, 26).[49]

---

[49]The evidence admits of at least some doubt that Waddell actually died of prostate cancer.  His medical records included the results of a chest x-ray indicating that he had a lung

Dr. Singer's testimony simply did not constitute "[p]ertinent evidence based on scientifically valid principles". ***Daubert***, 509 U.S. at 597.  He offered his numerous opinions based upon his "knowledge as an oncologist and the type of cancer that [Waddell] had" (TR-1, 51.   A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." ***United States v. Downing***, 753 F.2d 1224, 1242 (3rd Cir. 1985).

In this case, widespread acceptance within the community is an important factor in deeming particular evidence admissible.  Of course, ***Daubert*** requires such proof, but it is also complementary to a requirement of the Alabama Medical Liability Act. As the court has observed, ***infra,*** the Alabama Supreme Court has interpreted the "same general neighborhood" element to mean "the national medical community".  *See* ***Lamont*** **v.** ***Brookwood Health Services***, ***supra***.   Dr. Singer's testimony fails to establish either "widespread acceptance" of his theories or embracement of his theories within the national medical community or the local hospital community.

---

cancer (TR-2, 169).  Moreover, although he would have recommended hormonal therapy for Waddell had his cancer been diagnosed earlier, Dr. Singer agreed that there's no medical evidence that Waddell's life could have been prolonged with hormone therapy (TR-1. 69).    In the end, the court makes no findings on the cause of Waddell's death, but the lack of clarity in the evidence accredits the Court of Appeals' finding that "[u]ncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation".  ***McClain v. Metabolife Int'l.***, 401 F.3d at 1250.

## II.   CONCLUSION

Pearson-Heffner has not met her burden of proving the elements of applicable state law within the context of this FTCA case.  The trial evidence fell far below the standard required by the Alabama Medical Liability Act and by court opinions setting forth the appropriate analysis of expert testimony, including *Daubert* and its considerable progeny. Even a cursory review of Dr. Singer's testimony indicates that his conclusions do not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field".  *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152.   "[P]resenting a summary of [the] expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough".  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005).

The court was not untouched by the unfortunate reality of Gillium Waddell's illness and the suffering he underwent after being diagnosed with stage-four metastatic cancer.  As a veteran dependent for his income upon Social Security disability benefits, he was presumably also dependent upon the V.A. hospital for access to health care.  While it is true that he missed scheduled appointments and perhaps compromised the management of his health care by seeking treatment at two or more hospitals from several medical providers, it is doubtless that he endured a serious and quite painful disease from which he died very soon after his diagnosis.

Even so, the court is fully persuaded that the plaintiff has failed to prove any one of the elements of the law applicable to this case.  It is not enough to propose a standard of care

with a paucity of validity or recite anecdotal likelihood of outcomes with no widely acceptable data or principles to undergird them.  In summary, the plaintiff did not present "[p]ertinent evidence based on scientifically valid principles".  ***Daubert***, 509 U.S. at 597.

Accordingly, it is ORDERED, ADJUDGED and DECREED as follows:

1.   Judgement is entered for the United States and against Linda Pearson-Heffner, as Executrix of the estate of Gillium Walker Waddell, Jr.;

2.   Each party shall be responsible for its own costs in this case.

DONE this 30th day of October, 2006.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE